UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| G.W., et al., | ) | |
| | ) | |
| Plaintiff(s), | ) | No. C05-04124 BZ |
| | ) | |
| v. | ) | **ORDER GRANTING JUDGMENT FOR** |
| | ) | **DEFENDANT NEW HAVEN UNIFIED** |
| New Haven Unified School | ) | **SCHOOL DISTRICT** |
| District, et al., | ) | |
| | ) | |
| Defendant(s). | ) | |
| _____ | ) | |

On October 12, 2005, plaintiffs filed a complaint under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401, et seq., challenging the August 1, 2005, decision of the McGeorge School of Law Special Education Hearing Office.  Plaintiffs assert that defendants denied the minor plaintiff G.W. a Free Appropriate Public Education ("FAPE") in the Least Restrictive Environment ("LRE") and that the Hearing Officer erred in finding otherwise.  Plaintiffs seek a reversal of the Hearing Officer's decision, along with damages and reasonable attorneys' fees and costs.  This matter was heard on August 2, 2006.

In an IDEA action, the party challenging the Hearing Officer's decision bears the burden of persuasion.  Clyde K.

1

v. Puyallup School District, No. 3, 35 F.3d 1396, 1399 (9th Cir. 1994), *superseded by statute on other grounds*.  The court shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant appropriate relief.  20 U.S.C. § 1415(i)(2)(C). Although judicial review of state administrative proceedings under the IDEA is less deferential than review of other agency actions, Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471 (9th Cir. 1993), "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 206 (1982).  "The amount of deference accorded the hearing officer's findings increases where they are thorough and careful."  Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995).  After considering the Hearing Officer's findings carefully and her resolution of each material issue, the court is "free to accept or reject the findings in part or in whole."  Capistrano Unified, 59 F.3d at 891 (quoting Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987))(internal quotation marks omitted). "When the court has before it all the evidence regarding the disputed issues, it may make a final judgment in what 'is not a true summary judgment procedure [but] a bench trial based on a stipulated record.'"  Miller ex rel. Miller v. San Mateo-

1   Foster City Unified Sch. Dist., 318 F.Supp.2d 851, 859 (N.D.

2   Cal. 2004)(quoting Ojai, 4 F.3d at 1472).

3       Having reviewed the record, I find the following:  G.W.

4   was born in March 1998.  At the age of two he began receiving

5   specialized educational services from the Emeryville Child

6   Development Center and the East Bay Agency for Children

7   Therapeutic Nursery School.  He was evaluated in July 2002 by

8   the Regional Center of the East Bay and diagnosed with a

9   Pervasive Developmental Disorder-Not Otherwise Specified.

10      In September 2002, G.W. moved to Union City with his

11  family and began attending the Alvarado Elementary School in

12  the New Haven Unified School District (the "District").  He

13  was originally placed in a Special Day Class ("SDC") at the

14  school.  The class was small, with a low student to teacher

15  ratio, and he received weekly speech sessions.  Because there

16  were significant delays in his communication and social

17  skills, the District placed G.W. in a program with intensive

18  instruction and focus on developing his language and learning

19  skills by trained professionals.  However, because of his

20  severe behavioral problems – including frequently kicking,

21  biting and throwing objects at staff and other students – it

22  was eventually decided that he would receive intensive home

23  instruction, along with services from the Stepping Stones

24  Center for Autistic Spectrum Disorders ("Stepping Stones").

25      G.W.'s mother removed him from the Stepping Stones

26  program in June 2003.  An Individualized Education Program

27

28

("IEP")[1] meeting was held in August 2003 to determine the child's future schooling.  This eventually led to a new assessment by the Diagnostic Center, Northern California, in January 2004, which found that G.W. was mentally retarded. The assessment concluded he could return to a classroom setting if he were given appropriate support, such as a consistent routine and highly structured environment.  Other recommendations included engaging G.W. in preferred activities, allowing frequent breaks and reinforcing positive behavior and teaching alternatives to negative behavior.  In the first week of March 2004, G.W. returned to Alvarado Elementary School.  He was in a SDC, with a limited number of students, a familiar and fixed routine and structured environment.  His teachers allowed him to engage in his preferred activities, and a behavior intervention plan was implemented, including setting up a second classroom for G.W.'s individual use as a safe and separate place if his behavior warranted removal.

      G.W. continued to exhibit extreme and often violent behavior.  Despite his having two adults with him at all times and being allowed to take frequent breaks, his teachers complained that he was still kicking, biting, hitting and screaming.  The staff were concerned that G.W. was a danger to himself and others and that he exhibited some of the worst behavioral problems in their experience.  Because G.W.'s

---

[1]      An Individualized Education Program is tailored to the unique needs of the disabled child.  20 U.S.C. § 1412(a)(4).  An IEP is a written document prepared annually that outlines the educational plan for the student.

placement at Alvarado Elementary School was not working, the
District suggested moving G.W. to the Spectrum satellite
program ("Spectrum") at Bernard White Middle School.  The
mother agreed.  On April 20, 2004, G.W. started attending
Spectrum.

On June 8, 2004, the IEP team convened for G.W.'s annual
assessment.  By this time, G.W. had been attending Spectrum
for a few months.  The team recommended his continued
placement there with additional speech and language therapy
sessions lasting 30 minutes twice a week.  G.W. was also
eligible for extended school year services.  Based on the
Spectrum education coordinator's recommendations, the IEP team
also adopted a behavior intervention plan calling for
antecedent behavior, replacement behavior, reinforcement
strategies and emergency procedures to address G.W.'s
aggression.  Spectrum staff observed some improvement during
his time at Spectrum.  His violent outbursts and tantrums
seemed to be decreasing, and he seemed to be increasing from
40% to 85%-90% accuracy in completing tasks.

On September 27, 2004, G.W.'s mother removed him from
Spectrum because she felt that Spectrum was inappropriately
disciplining her son.  In response, the District convened an
IEP meeting in October 2004, at which it was agreed that the
District would fund a new private assessment of G.W., to be
conducted by Dr. Wolk.  The assessment took place between
November 2004 and January 2005.  Dr. Wolk diagnosed G.W. with
mild to moderate mental retardation.  She found that G.W.
suffered from impaired social, emotional, language, and

cognitive skills, but concluded that G.W. could interact
socially and, with appropriate school and home programming,
could improve his skills.  She made numerous recommendations,
including that G.W. start out at home with an aide, who would
help him gradually transition to a school setting with a
limited class size and trained professionals.  She also
recommended that G.W. be acclimated to the classroom,
encouraged and positively reinforced to communicate by using
language and sign language and exposed to a fixed routine with
little variability.  G.W. would benefit from communication
involving short, simple statements with pictures and other
sensory input and regular interaction with another child of
similar language ability.

Members of the IEP team and G.W.'s mother met with Dr.
Wolk to discuss her report in February 2002.[2]  The District
reiterated its offer of placing G.W. in Spectrum.  Plaintiffs
rejected this, and on May 6, 2005, G.W.'s attorney filed a due
process hearing request.  The District convened another IEP
meeting on May 16, 2005, where it continued to offer placement
in Spectrum with supplemental speech and language therapy
services.  Plaintiffs wanted to implement Dr. Wolk's
recommendations in a public school setting, but the District
refused to give G.W. the option of moving back into a public
elementary school.  Other potential non public school programs

---

[2]   Plaintiffs have cited no authority for their claim
that their procedural due process rights were violated because
Dr. Wolk did not meet with the entire IEP team.  The February
2005 meeting was not a typical IEP meeting, unlike the IEPs in
June 2004, October 2004 and May 2005, but was focused on
discussing Dr. Wolk's report.

1    were either unacceptable to plaintiffs or would not accept

2    G.W.  Plaintiffs did not accept continued placement in

3    Spectrum, so the due process hearing went forward.  The

4    Hearing Officer heard testimony from May 31, 2005 to June 8,

5    2005, and issued a decision on August 1, 2005.

6         The Hearing Officer decided that the District was not

7    denying G.W. a FAPE in the LRE.  She concluded that G.W. had

8    special needs due to his behavioral and language difficulties,

9    as borne out by numerous IEPs and assessments of several

10   specialists and teachers, and that he required specialized

11   instruction and one-on-one support with a highly structured

12   environment, a consistent routine, several breaks and behavior

13   intervention.  The Hearing Officer additionally concluded that

14   the District recognized G.W.'s needs in the June 2004, October

15   2004 and May 2005 IEPs and that placement in Spectrum with

16   supplemental services addressed these needs.  Spectrum serves

17   children with autism, developmental delays and Down's

18   Syndrome.  There are three classes, ranging in size from three

19   to ten students, with a staff of teachers, aides and several

20   specialists, including speech and language therapists.  During

21   his time at Spectrum, G.W. was in a class of four students,

22   ranging in age from six to ten years.  He had a 1:1 aide, and

23   there was a plan in place to address G.W.'s language needs and

24   behavioral problems.  Because of this, the Hearing Officer

25   concluded that the District offered a FAPE.  She further found

26   that the District's offer of placement in Spectrum was

27   reasonably calculated to provide G.W. an educational benefit

28   since it was meant to allow G.W. to improve his behavior and

1  succeed in school and there was some evidence that it was

2  working.  She also concluded that the District's offer

3  comported with G.W.'s IEPs.  After considering the testimony

4  of plaintiffs' witnesses and plaintiffs' contention that G.W.

5  would benefit from attending a public school by interacting

6  with typically developing children, the Hearing Officer

7  concluded that because placement in a SDC in a public school

8  had been unsuccessful in 2003 and 2004, Spectrum was the LRE

9  for G.W.  The Hearing Officer also found that while the

10 testimony that G.W.'s behavior had improved while at home was

11 not contradicted, that testimony did not address G.W.'s

12 behavior in a school setting and that his needs and behavior

13 had not changed significantly to warrant removal from

14 Spectrum.

15      Plaintiffs timely challenged the Hearing Officer's

16 decision.  As noted above, under the IDEA, the district court

17 must give "due weight" to the Hearing Officer's factual

18 determinations.  Rowley, 458 U.S. at 206.  In this case, the

19 Hearing Officer's determinations are thorough and careful, and

20 I accord them great weight.  Her decision spans 26 single-

21 spaced pages, and covers in detail all of the issues raised

22 during the six-day hearing.  She discussed the expertise and

23 credibility of witnesses that came before her at the hearing

24 and carefully and methodically evaluated their testimony.  She

25 considered all assessments and IEPs, including the Diagnostic

26 Center's report of January 2004 and Dr. Wolk's report of

27 January 2005.  She examined and addressed all issues relevant

28 to the question of whether the New Haven Unified School

1   District offered G.W. a FAPE in the LRE.

2       Having reviewed the record, I agree with the Hearing

3   Officer that the services provided by the District pursuant to

4   the 2004 IEPs and offered pursuant to the May 2005 IEP

5   constituted a FAPE.  They were reasonably calculated to, and

6   did, confer a meaningful educational benefit to G.W.  <u>See</u>

7   <u>Adams v. State of Oregon</u>, 195 F.3d 1141, 1149 (9th Cir.

8   1999)("Instead of asking whether the [District's offer] was

9   adequate in light of the [student's] progress, the district

10  court should have asked the more pertinent question of whether

11  [it] was appropriately designed and implemented so as to

12  convey [the student] with a meaningful benefit.").  At the

13  hearing on August 2, 2006, plaintiffs' counsel essentially

14  conceded that had the District offered these services at a

15  public school, plaintiffs would have accepted them.

16      The real dispute is whether placement at Spectrum

17  constituted the LRE.  States must ensure that a disabled child

18  has access to education in the LRE, which means that a

19  disabled child should be educated with non-disabled children,

20  or "mainstreamed," to the maximum extent appropriate.  20

21  U.S.C. § 1412(a)(5)(A).  <u>Poolaw v. Bishop</u>, 67 F.3d 830, 835

22  (9th Cir. 1995).  However, "mainstreaming" is not an "absolute

23  commandment."  <u>Poolaw</u>, 67 F.3d at 836.

24      Plaintiffs' claim rests largely on their interpretation

25  of Dr. Wolk's report.  First, they interpret Dr. Wolk's

26  recommendation that G.W. needed a special day class setting to

27  mean that he had to be placed in public school.

28  Unfortunately, Dr. Wolk did not recommend a specific placement

9

1   or address whether the placement should be in a public

2   school.[3]  Nor did Dr. Wolk testify.  Both sides had an

3   opportunity to call her at the hearing below and to supplement

4   the record before me with her testimony.  Neither side chose

5   to do so.  Nevertheless, there was substantial testimony on

6   this issue, from which I conclude that a special day class

7   describes an environment and not a location.  All of

8   defendants' witnesses so testified as did plaintiffs' expert,

9   Dr. Weiss.  Ms. Smith, plaintiffs' educational advocate,

10  testified that in her experience a special day class had to be

11  in a public school setting.  But I give less weight to her

12  testimony since she was plaintiffs' advocate.  Based on this

13  record, I conclude that placement in Spectrum could be a

14  special day class and that the environment Spectrum provided

15  is consistent with what all the education professionals who

16  testified believe is required in a special day class.  To the

17  extent educators may disagree on this issue, I am mindful of

18  the admonition that cour[3]ts should not "substitute their own

19  notions of sound educational policy for those of the school

20  authorities which they review."  <u>Rowley</u>, 458 U.S. at 206.

21  _____

22       [3]      Based on their reading of Dr. Wolk's report,
    plaintiffs also claim that the District violated plaintiffs'
    right to have G.W.'s parents involved in the development of
23  G.W.'s IEP by failing to follow Dr. Wolk's recommendations
    which plaintiffs contend required G.W. be placed in public
24  school.  Parents do have a right to participate in the
    development of their child's IEP.  <u>Amanda J. v. Clark Co.</u>
25  <u>School District</u>, 267 F.3d 877, 882 (9th Cir. 2001).  However,
    G.W.'s mother was present at all IEP meetings and the meeting
26  with Dr. Wolk.  Additionally, as discussed above, Dr. Wolk did
    not specifically address whether G.W. should be placed in a
27  public school.

28

1    Plaintiffs next argue that Dr. Wolk's references to the
2  child's need to associate with "developmentally appropriate"
3  peers means that he must be placed in a setting in which he is
4  exposed to children who do not have developmental
5  disabilities, which cannot happen at Spectrum.  Plaintiffs go
6  on to argue that one of the reasons G.W. misbehaved or
7  otherwise had difficulty learning is that he mimicked the
8  behavior of other disabled children when he was at Spectrum.
9  The District contends that Dr. Wolk's references to G.W. being
10  with developmentally appropriate children are made in the
11  context of getting him out of his home, where his mother has
12  kept him, so he can interact with his peers.  The District
13  contends that developmentally appropriate peers are those with
14  which he can readily interact and that placing him in a
15  setting with non-disabled children has proven more restrictive
16  for him since he has even greater difficulty functioning and
17  spends more time with staff than with his peers.  Once again,
18  Dr. Wolk did not define this term, and there is no evidence in
19  the record of what the term "developmentally appropriate"
20  means in the field of child education.  Whatever the precise
21  meaning of the term, the court agrees with the Hearing Officer
22  that in the fall of 2004 and the first half of 2005, Spectrum
23  was the LRE in which G.W. could be placed.  Prior efforts to
24  place him at Alvarado Elementary School, a public school, had
25  been unsuccessful because of his behavioral problems.  At
26  Spectrum, his behavior and his educational development seemed
27  to be slowly but surely improving.  Nor is there any evidence
28  that his problems resulted from mimicking the behavior of the

other disabled students at Spectrum.  To the contrary, the
evidence was that he was far more misbehaved than his peers.
Clyde K., 35 F.3d at 1402 ("Disruptive behavior that
significantly impairs the education of other students strongly
suggests a mainstream placement is no longer appropriate" and
school officials "are not required to sit on their hands when
a disabled student's behavioral problems prevent both him and
those around him from learning.").  I therefore conclude that
the IEPs offered by the District in 2004 and 2005 provided, or
would have provided, if accepted, the child with a FAPE in the
LRE.[4]

        Therefore, **IT IS ORDERED** that plaintiffs' motion for
summary judgment is **DENIED**.  **IT IS FURTHER ORDERED** that
judgment shall be entered in favor of the District.[5]

        **IT IS FURTHER ORDERED** that the parties' evidentiary
objections are **OVERRULED**.  I have not considered plaintiffs'
supplemental declarations, nor have I allowed Dr. Wolk to
testify.[6]  [docket ## 53, 59]  As to plaintiffs' objections on
grounds of relevance, defendants' attempts to procure the

_____

        [4]    I offer no view on whether the IEPs which are
considered in this order are currently appropriate.

        [5]    Although the District did not move for summary
judgment, the court may grant judgment in its favor in an IDEA
proceeding.  See Kassbaum v. Steppenwolf Productions, Inc., 236
F.3d 487, 494 (9th Cir. 2000); Hunger v. Leininger, 15 F.3d
664, 669 (7th Cir. 1994).

        [6]    After the case management conference, I set a
schedule for the parties to supplement the administrative
record if they wished to do so.  Plaintiffs did not timely move
to supplement the administrative record.  Their subsequent
request that Dr. Wolk testify is untimely.  For similar
reasons, I have not considered plaintiffs' declarations of
Valerie Hodges and Jean Murrell Adams.

1    record are relevant to plaintiffs' argument that the failure

2    to provide them with the record violated their procedural

3    rights.  [docket ## 36, 51, 55]  As to defendants' objections

4    to the filing of the mediation agreement, I asked that it be

5    filed for the limited purpose of determining whether the

6    parties had agreed to be bound by Dr. Wolk's recommendations,

7    not for the purpose of "prov[ing] liability for or invalidity

8    of the claim or its amount."  FRE 408.  Since the mediation

9    agreement did not speak to the issue, it is irrelevant.

10   [docket # 49]  To the extent that any of the parties'

11   objections are valid, they go to the weight of the evidence.

12   The District's request for judicial notice is **GRANTED**.

13   [docket # 44]

14   Dated:  August 4, 2006

15                       _____

16                         Bernard Zimmerman
                          United States Magistrate Judge

17   G:\BZALL\-BZCASES\G.W\JudgmentBZ2.wpd

18

19

20

21

22

23

24

25

26

27

28